936 F.2d 988
 BOARD OF TRUSTEES OF the PUBLIC EMPLOYEES' RETIREMENT FUND
OF the STATE OF INDIANA, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
and United States of America, Defendants-Appellees.
 No. 90-3010.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 19, 1991.
Decided July 15, 1991.
 
 Michael Schaefer, Deputy Atty. Gen., Federal Litigation, Indianapolis, Ind., for plaintiff-appellant.
 Thomas E. Kieper, Asst. U.S. Atty., Indianapolis, Ind., Edward L. Koven, Dept. of Health and Human Services, Region V, Office of General Counsel, Chicago, Ill., for defendants-appellees.
 Before EASTERBROOK, MANION and KANNE, Circuit Judges.
 EASTERBROOK, Circuit Judge.
 
 
 1
 When the federal government pays its share of the costs of a cooperative state-federal program, it underwrites part of the fringe benefits of the employees who carry out the program on behalf of the state. It is difficult, however, to define the proper share of the federal government. States are tempted to set up accounting systems that shift a disproportional share of the total costs of their employees to the federal government. Understanding this incentive, the federal government inspects the books to protect its interest, and it insists on a rule of neutrality: the state may not allocate to federal programs costs greater than those the state charges to itself for an equivalent slice of the employee's time.
 
 
 2
 The federal government audited Indiana's reimbursement for 1971-78 and concluded that the state made retirement contributions on behalf of federally-funded workers exceeding those on behalf of workers paid from state coffers. We simplify the facts to lay bare the nature of the dispute. Indiana has a defined-benefit retirement plan (the Public Employees' Retirement Fund of the State of Indiana, "PERF" for short) for all state and municipal employees. Indiana treats its Employment Security Division (IESD) as a separate entity for purposes of contributions to PERF. The IESD is indeed an unusual part of state government, because the federal government reimburses 100% of the costs of its administration of the unemployment compensation program, including the full salaries and benefits of state employees. 42 U.S.C. Secs. 502(a), 1101(c)(1)(A). Reimbursement of administrative expenses began in 1935 as a carrot to states considering unemployment compensation programs.
 
 
 3
 Retirement benefits in Indiana follow the standard pattern for workers in the public sector: payments depend on the number of years of service and the average salary during the years preceding retirement. The same formula is used to determine benefits for all state employees, including those of the IESD. An identical formula for benefits does not imply equal costs. Turnover has been slower in the IESD than elsewhere, so its retirees have both more years of service and higher terminal salaries than do workers at other agencies. Both the additional years and the higher salaries translate to higher pension benefits.
 
 
 4
 At the beginning of the audit period there were three categories of contributing agencies: municipal governments, the IESD, and other state agencies. If PERF's calculations showed that any of these three categories was underfunded (that is, if the capital balance of the account plus current contributions did not match the present value of promised benefits), PERF required the municipality or agency to increase the rate of contributions to eliminate the underfunding by the end of a fixed number of years. That number was 30 years for the IESD and other state agencies, 15 years for municipalities.
 
 
 5
 In 1972, when PERF's actuaries determined that the IESD's account would be exhausted in 3 1/2 years, Indiana began charging the IESD a higher rate, which would end the underfunding in 15 years. This meant that the federal government, funding the IESD pensions, was paying a higher percentage of the wage bill than the state contributed for employees of other agencies. Disparity in assessment was only half of the story; the state legislature did not appropriate all of the money PERF sought for state-funded agencies. Appropriations fell short of the amount required to eliminate the underfunding even within 30 years. The conjunction of the different periods for achieving full funding with the failure of the legislature to appropriate the full sums PERF assessed produced:
 
 
 6
 Contribution Rates (% of gross payroll)
Fiscal Year IESD State
1972 13.77 4.98
1973 13.77 4.76
1974 Qs 1 & 2 12.45 4.01
1974 Qs 3 & 4 12.45 2.89
1975 10.16 3.62
1976 9.15 6.00
1977 8.54 6.00
1978 7.82 6.00
 
 
 7
 Federal auditors demanded in 1980 that PERF repay the difference, which with the sums attributable to a few other agencies came to more than $6 million. Indiana balked, and after losing in the highest administrative tribunal (the Departmental Appeals Board of the Department of Health and Human Services) the state filed this action in 1982 against HHS seeking to block collection and prevent the government from reducing current payments in order to recoup. The United States eliminated any potential jurisdictional problem by intervening and making a counterclaim for the sum HHS had computed. The United States moved for summary judgment. Briefs were exchanged in March 1984, the case was argued in February 1985, and in June 1990 the district judge granted summary judgment in favor of the federal government.
 
 
 8
 Indiana contends that a memorandum written in 1959 on the topic of PERF's treatment of the IESD as a separate entity estops the United States to compare the IESD to other state agencies. The memo memorializes a meeting between PERF and regional officials of the Department of Labor; it refers to a letter written in 1945 by the head of the Department's office in Chicago. The 1945 letter and the memo could be read, as Indiana does, to accept full funding of the IESD's pension obligations even though other units of state government are underfunded; they could also be read, as the federal government does, to require comparable treatment of the IESD and other state agencies. No matter. Indiana wants money from the Treasury; it invokes estoppel to prevent the federal government from reducing current payments in order to make up what HHS believes to have been overpayments in the 1970s. OPM v. Richmond, --- U.S. ----, ----, 110 S.Ct. 2465, 2471-76, 110 L.Ed.2d 387 (1990), holds that courts may not alter statutory conditions for the drawing of public funds through the formula of estoppel.
 
 
 9
 According to 42 U.S.C. Sec. 502(a), states are entitled to "such amounts as the Secretary of Labor determines to be necessary for the proper and efficient administration" of the state's unemployment compensation program. Indiana wants a greater sum than the Secretary believes necessary for "proper" administration; to get it Indiana needs to address the legality of the Secretary's determination in 1982. Payments for the 1970s depend on the rules in force in the 1970s; it is not enough to contend that all was settled by a subordinate's letter in 1945 and a memo to file in 1959. Perhaps the Secretary has the authority to bind the United States by contract, but Indiana does not contend that either the 1945 letter or the 1959 memo (which no federal official signed) is a contract. Section 502 contemplates annual determinations and authorizes the Secretary of Labor (acting in this case through an appellate tribunal of HHS) to establish criteria. Different Secretaries may have different views of what is "proper and efficient administration". Before making a dramatic change in the way it assessed the pension contributions of the IESD in 1972, Indianapolis should have checked with Washington.
 
 
 10
 All that remains is Indiana's argument that the Departmental Appeals Board misinterpreted the law. Acting for the President, the Bureau of Budget issued a circular specifying reimbursable expenditures for all federal grant programs. Agencies charged by statute with particular programs adopted these government-wide rules as part of their own regulations. At the beginning of the audit period, the rules were contained in Budget Bureau Circular A-87. In 1973 the President transferred the rule-writing function to the General Services Administration, Executive Order No. 11,717, 38 Fed.Reg. 12,315 (1973), which promulgated Circular A-87 as a regulation. 45 C.F.R. Sec. 74.171 (1974). The GSA reissued Circular A-87 in 1974 without material change as Federal Management Circular 74-4. The Department of Health and Human Services, which acts for the entire national government in auditing claims for indirect costs (including pensions), has included Circular 74-4 in different versions of its own regulations. The current regulation is 45 C.F.R. Sec. 74.171(a), incorporating the circular by reference.
 
 Part C.1 of Circular 74-4 provides:
 
 11
 1. Factors affecting allowability of costs. To be allowable under a grant program, costs must meet the following general criteria: ...
 
 
 12
 d. Be consistent with policies, regulations, and procedures that apply uniformly to both federally assisted and other activities of the unit of government of which the grantee is a part.
 
 
 13
 The auditor and a series of administrative bodies all determined that Indiana had not applied consistent standards to the IESD and other state agencies. They concluded that the IESD, as a part of the state government, must be compared with other state agencies--which used a 30-year period over which to amortize underfunding--rather than with units of local government using a 15-year period. They also observed that the legislature of Indiana had elected not to pay even the amount PERF thought essential to achieve full funding within 30 years. A comparison between actual payments by the IESD and actual payments by other state agencies made clear the lack of consistency.
 
 
 14
 Indiana attacks this decision on the ground that because the employees of the IESD have longer average tenure, a higher contribution rate is necessary to produce full funding. Yet HHS did not insist that Indiana use identical contribution rates. It concluded, rather, that Indiana had not derived its contribution rates by the use of consistent criteria. Indiana was not using different rates so that different agencies whose work forces had different age and tenure combinations could achieve full funding at the same time. Instead it set different amortization periods for the IESD and other agencies, and Indiana did not pay toward the pensions of state employees even the amounts called for by these different formulae. Paragraph C.1.d reflects a decision to protect the federal government by parity of treatment. Some states have higher wages than others; some have more generous pension plans than others; the federal government tracks these differences, allowing the state's willingness to pay out of its own pocket to supply vicarious representation to federal interests.
 
 
 15
 Whatever the state actually pays to state workers is the benchmark for measuring the federal government's share. Indiana pays its public workers partly in cash and partly in promises. Indiana is free to make that choice for itself but may not claim 100% in cash up front from the federal government if it is unwilling to put the retirement program for other state employees on an equivalently well-funded basis. The federal government has a legitimate concern that Indiana will promise its employees the moon but pay less when a crunch comes--after having collected enough from the federal government to pay the whole amount to the employees at the IESD. Even though the state puts the full faith and credit of Indiana behind PERF's obligations, including those to employees of the IESD, Indiana could choose to make the pension formula less generous. That would cut the state's future pension contributions, after the federal government had paid in full according to today's formula. Perhaps Indiana would be tempted to use the excess in the IESD's account with PERF to fund the benefits of other workers. (HHS believes that it is already doing so in the way it apportions investment income within PERF; Indiana denies the charge, and we need not determine who is right.)
 
 
 16
 If Indiana wants to top up the retirement account available to the IESD, it has only to adopt the same formula for (other) state workers. This could come to grief if Indiana moves toward full funding during a time of prosperity (the most tempting time to top up a pension plan). Prosperity means low unemployment, which means fewer workers at the IESD: its employment is countercyclical. In boom times the federal government makes less money available to fund the administration of unemployment bureaucracies. So when Indiana decides to catch up for itself, it may have trouble catching up for the IESD. In the worst case, the federal government would discontinue all payments under Sec. 502, leaving Indiana to fill the IESD account from the state's budget. Such possibilities produce sympathy with the state's argument that comparable treatment should mean comparable promises: a state treats federally-funded and state-funded workers consistently when it promises each the same pension formula and ensures (by pledging the state's full faith and credit) that these promises will be kept. All the state wants is the actuarial value of that promise from the federal government now, securing its position against the possibility that the national government's role in funding will shrink. From this perspective, how the state apportions its own payments over time would be irrelevant.
 
 
 17
 Whatever the attractions of this position to the states, it would be a nightmare for the federal government--which would find computations of state and federal shares much harder to make, and would face the specter (discussed above) of states cutting back on pensions after the federal government has paid. We deal here with the interpretation of a government-wide regulation by the agency charged with implementing this rule for the entire national government. Agencies possess substantial latitude to interpret their regulations, United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Homemakers North Shore, Inc. v. Bowen, 832 F.2d 408, 411-12 (7th Cir.1987), even regulations initially drafted elsewhere in the government. Pauley v. BethEnergy Mines, Inc., --- U.S. ----, ----, 111 S.Ct. 2524, 2534-35, 115 L.Ed.2d 604 (1991). Section 502 allows the Secretary to set a reimbursement policy--that is, to exercise judgment. That judgment is exercised, and the policy made, in the course of interpretation. HHS did not overstep permissible bounds when concluding that safety for federal taxpayers lies in consistent rules for determining cash contributions to pension funds, rather than consistent rules for determining the pension entitlements of the workers.
 
 
 18
 AFFIRMED.