FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

CONRADO VIRGEN-MENDOZA,
AKA Mendoza,

*Defendant-Appellant*.

No. 21-10109

D.C. No.
1:19-cr-00015-
DAD-BAM-3

OPINION

Appeal from the United States District Court
for the Eastern District of California
Dale A. Drozd, District Judge, Presiding

Argued and Submitted December 8, 2022
San Francisco, California

Filed January 26, 2024

Before: Jacqueline H. Nguyen and Gabriel P. Sanchez,
Circuit Judges, and Stephen R. Bough,[*] District Judge.

Opinion by Judge Sanchez

---

[*] The Honorable Stephen R. Bough, United States District Judge for the
Western District of Missouri, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel affirmed Conrado Virgen-Mendoza's conviction on one count of conspiracy to aid and abet his brother Paulo Virgen-Mendoza's flight to Mexico to avoid prosecution for the murder of a police officer, in violation of 18 U.S.C. § 1073.

Conrado argued that the district court committed reversible error by permitting the Government to argue in closing that it was not necessary to prove that each co-conspirator knew about Paulo's intention to travel to Mexico. The element that confers federal jurisdiction under § 1073 is movement or travel in interstate or foreign commerce. The panel explained that because the substantive § 1073 offense of flight to avoid prosecution never occurred, the Government was required to prove that the conspirators knew of the fact giving rise to federal jurisdiction: that they were aiding Paulo's flight into Mexico to avoid prosecution. The panel held that the Government was therefore required to prove that Conrado knew about the plan and specifically intended to help Paulo cross the border to Mexico avoid prosecution. The panel concluded, however, that any misstatement of the law by the Government did not materially affect the verdict, as the brief misstatement in rebuttal factored very little into the parties' closing arguments and was neutralized by the district court's instructions to the jury.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the evidence is sufficient, when viewed in the light most favorable to the Government, that Conrado knew about and specifically intended to help Paulo cross the border to Mexico to avoid prosecution.

Conrado argued that the district court abused its discretion by permitting the Government to read transcripts of his interviews with law enforcement to the jury without also playing or admitting into evidence the Spanish-language interview recordings. The panel did not need to decide whether the best evidence rule required admission of the recordings because even assuming error, the exclusion of the recordings did not materially affect the verdict.

## COUNSEL

Peggy Sasso (argued), Assistant Federal Defender; Heather E. Williams, Federal Public Defender; Federal Public Defender's Office, Fresno, California; for Defendant-Appellant.

Michael G. Tierney (argued) and Karen A. Escobar, Assistant United States Attorneys; Camil A. Skipper, Assistant United States Attorney, Appellate Chief; Phillip A. Talbert, United States Attorney; United States Department of Justice, United States Attorney's Office, Fresno, California; for Plaintiff-Appellee.

**OPINION**

SANCHEZ, Circuit Judge:

A jury convicted Conrado Virgen-Mendoza ("Conrado") on one count of conspiracy to aid and abet his brother Paulo Virgen-Mendoza's ("Paulo") flight to Mexico to avoid prosecution for the murder of a Newman, California police officer, in violation of 18 U.S.C. § 1073. In this appeal, Conrado challenges the sufficiency of the evidence to support his conviction, arguing the Government failed to establish that he knew about and specifically intended to further the object of the conspiracy—helping Paulo cross the border into Mexico to avoid prosecution. Conrado also contends he was prejudiced by the Government's closing argument suggesting it was not necessary to prove each co-conspirator's knowledge of a plan to assist Paulo's flight to Mexico. Finally, Conrado asserts that the district court abused its discretion by permitting English translations of his interviews with law enforcement to be read to the jury without admitting into evidence the underlying Spanish-language interview recordings. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

**I.**

In the early morning hours of December 26, 2018, Paulo Virgen-Mendoza shot and killed Police Corporal Ronil Singh during a traffic stop. Around 2:30 a.m., Paulo placed a call to his brother Conrado. An hour later, Conrado left his home in Chowchilla and picked up the brothers' friend Erik Quiroz Razo ("Erik") in Merced before arriving to Paulo's

home in Newman, California.[1] Paulo's girlfriend informed Conrado that Paulo shot an officer. Paulo asked Conrado and Erik to help him put plywood at the entrance of his carport to obscure his truck. They then left in Conrado's car and headed in the direction of Patterson, California.

Around 7:30 a.m., law enforcement broadcast the first of several Blue Alerts about the shooting of Corporal Singh. Minutes later, Conrado's wife called Conrado to tell him about the Blue Alert and Paulo's involvement in the shooting of an officer. She told Conrado to drop his brother off and return home. At 7:40 a.m., Adrian Virgen-Mendoza ("Adrian"), Conrado and Paulo's brother, called Paulo after learning about the Blue Alert. They spoke for almost two minutes. Paulo then asked Conrado to take him to their uncle's ranch in Stockton. When Conrado, Paulo, and Erik arrived at the ranch, Paulo asked if he could hide out for a few days. His uncle refused.

At 8:19 a.m., law enforcement broadcast a second Blue Alert conveying the news that Corporal Singh had passed away. Conrado's uncle testified that Paulo stated he was going "to leave" and that he understood this statement to mean leave for Mexico. Conrado's aunt testified that Paulo said he wanted to go to Mexico. According to the aunt, Paulo wanted to stay at their home for three days because he "didn't have any plans. All he wanted to do was go to Mexico." Paulo said he needed to find someone who could get him out. She later testified that when Paulo stated he wanted to "get out," she assumed this meant getting back to Mexico. Conrado, Erik, and Paulo left the ranch. At Paulo's

---

[1] Conrado testified that he, Paulo, and Erik planned to work a construction job in Fairfield that morning.

request, Erik threw a plastic bag containing the firearm used in the shooting into a dumpster.

Conrado started driving Paulo and Erik to Fairfield. Paulo told Conrado to pull over because he needed to think about what he was going to do and where he was going to go. Paulo decided they should drive to Erik's house in Merced. After dropping them off, Conrado returned home where his wife called the police. California Highway Patrol Lieutenant Mayolo Banuelos responded to the call and interviewed Conrado in his native Spanish, recording the interview. Lieutenant Banuelos testified that Conrado was very emotional, upset, in tears, and in shock.[2]

That afternoon, Adrian contacted an acquaintance on Facebook, Deeby Duran, who was known to smuggle individuals across the U.S.-Mexico border. Adrian conveyed to Deeby that he needed to get someone out to Mexico. Deeby responded that she would need an initial payment of $400 and another $200 payment when Paulo was picked up.

That evening, Conrado went to the police station for more questioning. Stanislaus County Deputy Sheriff Jesse Tovar conducted the interview in Spanish and recorded a video of the interview. The next morning, Adrian sent $400 to Deeby. Adrian drove Paulo to a relative's home in Bakersfield where Paulo spent the night. Law enforcement arrested Paulo the following morning.

---

[2] At 11:17 a.m., Adrian called Conrado on his cell phone while the police were present at Conrado's house. Adrian testified that they did not have any discussion about helping Paulo flee to Mexico. That was the last call Conrado received before he voluntarily turned his phone over to police.

These events resulted in a multi-count indictment against seven defendants, including Erik Quiroz, Adrian and Conrado Virgen-Mendoza, and several others. Three defendants, including Adrian, pled guilty before trial. A thirteen-day jury trial resulted in guilty verdicts against Erik and Conrado on count three for conspiracy to aid and abet a violation of 18 U.S.C. § 1073, flight to avoid prosecution across state lines.[3] The four defendants at trial were acquitted on all remaining counts.

## II.

Conrado argues that the district court committed reversible error by permitting the Government to argue in closing that it was not necessary to prove that each co-conspirator knew about Paulo's intention to travel to Mexico. To determine whether the Government misstated the law, we first address whether conspiracy to aid and abet a violation of § 1073 requires proof that each co-conspirator have actual knowledge of the fact giving rise to federal jurisdiction—that they were helping Paulo cross state lines to avoid prosecution.

## A.

As the district court observed, the Government charged the defendants with a very unusual conspiracy: to aid and abet the commission of a federal offense that is rarely prosecuted and, in this case, never occurred. To find the defendants guilty under count three, the jury was instructed

---

[3] We affirmed Erik Quiroz's conviction in an unpublished disposition. *See United States v. Quiroz*, 860 Fed. App'x 477, 478–79 (9th Cir. 2021).

that the Government must prove each of the following elements of conspiracy beyond a reasonable doubt:

> First, beginning on or about December 26, 2018 and ending on or about December 28, 2018, there was an agreement between two or more persons to aid and abet Paulo Virgen Mendoza's flight to avoid prosecution;
>
> Second, the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it;
>
> Third, one of the members of the conspiracy performed at least one overt act on or between December 26, 2018 and December 28, 2018 for the purpose of carrying out the conspiracy.

The district court further instructed that the object of the conspiracy was "to aid and abet Paulo Virgen-Mendoza's flight to avoid prosecution" and that to "aid and abet" means "intentionally to help someone else commit a crime."[4] The

---

[4] The jury was instructed on aiding and abetting as follows: "The crime of aiding and abetting another individual's flight to avoid prosecution has four elements:

> First, someone else committed the crime of flight to avoid prosecution in violation of Section 1073 of Title 18 of the United States Code;
>
> Second, the defendant aided, counseled, commanded, induced, or procured that person with respect to at least one element of flight to avoid prosecution;

jury was also instructed that "[a] defendant acts with intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime."

Finally, the district court instructed that the substantive offense of flight to avoid prosecution under § 1073 requires proof that "Paulo Virgen Mendoza moved or traveled between one state and another or between one state and a foreign country" and that he did so with the intent to avoid prosecution for a felony under the laws of the jurisdiction from which he was fleeing, in this case murder under the State of California.

Prior to closing arguments, the Government advanced the position that it was not necessary to prove that each co-conspirator had actual knowledge that Paulo intended to flee to Mexico. Rather, the Government sought permission to argue that the jury could convict so long as *one* of the co-conspirators knew Paulo was going to Mexico. The defense argued that this was a misstatement of law and that the object of the conspiracy, moving someone across state or international lines, has to be known to the conspirators at the time they join in the conspiracy. The district court found the Government's argument "about as thin of a reed as you can possibly dance on," but ultimately agreed with the

---

Third, the defendant acted with an intent to facilitate the crime of flight to avoid prosecution; and

Fourth, the defendant acted before the crime was completed."

Government over defense counsel's objections.  The jury was not present for this colloquy.

The Government subsequently backed away from this position in closing, arguing instead that the conspirators all knew Paulo intended to make his way to Mexico.  *See infra* Section II.B.  On appeal, the Government continues to assert that conspiracy to violate a federal criminal statute does not require proof that each co-conspirator have knowledge of the statute's jurisdictional element, citing *United States v. Chang Ru Meng Backman*, 817 F.3d 662, 667 (9th Cir. 2016) and *United States v. Feola*, 420 U.S. 671, 676 n.9 (1975).  While that may be true as a general matter, we explain why the Government is incorrect under the circumstances of this case.

*Backman* involved a criminal prosecution for sex trafficking under 18 U.S.C. § 1591(a).  The statute requires proof that a defendant "knowingly—(1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person."  18 U.S.C. § 1591(a).  We rejected the defendant's contention that the term "knowingly" modified not only the unlawful act of recruiting or transporting a person but also the jurisdictional element "in or affecting interstate or foreign commerce." *Backman*, 817 F.3d at 667.  Such a construction, we concluded, was not apparent from a plain reading of the statute, nor did it accord with "[t]he longstanding presumption . . . that the jurisdictional element of a criminal statute has no mens rea." *Id.* (citing *Feola*, 420 U.S. at 676 n.9).  Our holding in *Backman* does not support the Government's position because it did not involve, as here, a conspiracy to commit a federal offense that never materialized.  Under these circumstances, *Feola* requires us

to ask whether the actual knowledge of the parties to an unlawful agreement suffices to establish the existence of federal jurisdiction. *Feola*, 420 U.S. at 695–96.

In *Feola*, the Supreme Court examined whether conspiracy to assault a federal officer in the performance of his official duties required that each defendant know the intended victim was a federal officer. *Id.* at 672–73. Defendants conspired to assault potential drug buyers who, unbeknownst to them, were undercover federal narcotics agents. *Id.* at 674–75. Had the attack on the federal agents occurred, it would not have been necessary to prove that the conspirators were aware of the official status of their victims. *Id.* at 692; *see also id.* at 695 ("Federal jurisdiction always exists where the substantive offense is committed in the manner therein described, that is, when a federal officer is attacked.").

Because one of the undercover agents thwarted the attack, however, the Court considered whether the "unfulfilled agreement to assault, . . . standing alone, constituted a sufficient threat to the safety of a federal officer so as to give rise to federal jurisdiction." *Id*. The Court explained that if the conspirators agreed on the specific identity of the individuals to be attacked and those individuals were in fact federal officers—in other words, if there was agreement on the facts triggering federal jurisdiction—that would satisfy the jurisdictional requirement. *Id*. But if the object of the intended attack was not identified "with sufficient specificity" to make it likely the attack would be carried out on a federal officer, it would be "impossible to assert that the mere act of agreement to assault poses a sufficient threat to federal personnel and functions so as to give rise to federal jurisdiction." *Id*. at 695–96. In short, "the jurisdictional requirement is satisfied

by the existence of facts tying the proscribed conduct to the area of federal concern delineated by the statute." *Id.* at 695.

The element that confers federal jurisdiction under § 1073 is "move[ment] or travel[] in interstate or foreign commerce." 18 U.S.C. § 1073. Because violation of § 1073 never occurred here, the Government was required to prove that the conspirators knew of the fact giving rise to federal jurisdiction: that they were aiding Paulo's flight into Mexico to avoid prosecution. *See Feola*, 420 U.S. at 696. Without advance knowledge of this unfulfilled plan, there would not be "a sufficient threat" to federal interests "so as to give rise to federal jurisdiction" against Conrado. *Id.*

We therefore hold that to convict on count three, the Government was required to prove that Conrado knew about and specifically intended to help Paulo cross the border to Mexico to avoid prosecution.

**B.**

In light of our conclusion, we consider next whether the Government misstated the knowledge requirement in closing argument and, if so, whether the misstatement of law prejudiced the defendant. "A prosecutor's misstatements of law during closing argument provide grounds for reversal." *United States v. Velazquez*, 1 F.4th 1132, 1136 (9th Cir. 2021). "We will not reverse a conviction, however, unless the prosecutor's statements during closing argument 'are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge.'" *Id.* (quoting *United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984)). To demonstrate prejudice, the defendant "must show that it is more probable than not that the misconduct materially affected the verdict." *United States v. Tucker*, 641 F.3d 1110, 1120 (9th Cir. 2011) (citation omitted). The

record discloses that any misstatement by the Government did not materially affect the verdict.

As noted above, the Government retreated from its earlier position and argued that Conrado and the other members of the conspiracy knew of Paulo's intention to get to Mexico.  The Government pointed to evidence of the many phone calls on the morning of December 26 between the co-conspirators, as well as Conrado transporting Paulo, hiding him, changing vehicles, moving him to various locations, and giving false statements to law enforcement to protect Paulo.  The Government emphasized that Paulo was from Mexico, had family there, and was running around asking for help to hide him and get him out.  As Conrado's aunt testified, "where else was he going to go?"  The jury "didn't need to hear the word 'Mexico' for each of these defendants to know where Paulo was going."

Defense counsel argued that to convict Conrado as a member of the conspiracy, the jury had to find that Conrado knew about and agreed to help Paulo flee to Mexico. Defense counsel argued there was no evidence Conrado knew about any such plan because Paulo's plans were formed long after Conrado had returned home and was no longer in contact with his brothers.  The evidence established, at best, an assumption by the aunt and uncle, and an assumption is not proof beyond a reasonable doubt that Conrado entered into an agreement with someone else to get Paulo to Mexico.

While the Government briefly stated in rebuttal that "actual knowledge was not required" and that a co-conspirator's "belief"—rather than knowledge—was sufficient to prove this conspiracy, the Government immediately returned to its prevailing point that Conrado

and the other defendants "knew" that Paulo was headed to Mexico. In the context of all the facts in evidence, the Government maintained, it was reasonable for the jury to infer that Paulo intended to leave for Mexico.

The record establishes that the brief misstatement of law in rebuttal factored very little into the parties' closing arguments. Defense counsel reiterated several times that the conspiracy charge required proof that Conrado had actual knowledge of the plan to get his brother to Mexico, and counsel emphasized the absence of evidence supporting Conrado's knowledge of or agreement to help Paulo flee across state lines. And the gravamen of the Government's closing argument was that Conrado knew Paulo intended to head to Mexico when Paulo sought help from others.

In addition, any prejudice by the misstatement was neutralized by the jury instructions. As Conrado acknowledges on appeal, the district court's jury instructions adequately stated the knowledge requirements for the charged conspiracy. The jury was instructed on the substantive elements of flight to avoid prosecution, including the crossing of state or international lines to avoid prosecution. *See* 18 U.S.C. § 1073. The jury was instructed that aiding and abetting required proof the defendant "actively participate[d] in a criminal venture with advance knowledge of the crime and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime." *See id.* § 2. And the jury was instructed that a conspiracy requires "an agreement between two or more persons" to accomplish its object and that the defendant entered into an agreement knowing of its object and intending to help accomplish it. *See id.* § 371. Taken together, these instructions required the Government to prove that Conrado knew Paulo was planning to go to

Mexico and that any assistance Conrado provided to his brother was done with the intent of aiding his flight out of the country. *See Feola,* 420 U.S. at 695. We have no trouble concluding that the district court's instructions to the jury "neutralized" any misstatement of law in rebuttal. *See Birges*, 723 F.2d at 672.

## III.

Conrado next challenges the sufficiency of the evidence to support his knowledge of the charged conspiracy. We review de novo claims of insufficient evidence to support a jury conviction. *United States v. Charley*, 1 F.4th 637, 643 (9th Cir. 2021). "Evidence supporting a conviction is sufficient if, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). We reverse if the evidence is "such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1165 (9th Cir. 2010).

The evidence is sufficient, when viewed in the light most favorable to the Government, that Conrado knew about and specifically intended to help Paulo cross the border to Mexico to avoid prosecution. The evidence at trial included the many phone calls on the morning of December 26 between Conrado and Paulo, Conrado and Erik, Adrian and Paulo, and Adrian and Conrado, discussing Paulo's shooting of Corporal Singh and what to do next. There was evidence of Conrado transporting Paulo, hiding him, changing vehicles, moving him to various locations, and giving false statements to law enforcement to protect his brother. There

was testimony from Conrado's aunt and uncle that Paulo stated in Conrado's presence Paulo wanted to "get out" or "leave" the area, and that "[a]ll he wanted to do was go to Mexico." And the jury heard testimony that Paulo was from Mexico, that his parents lived in Mexico, that he was looking for someone to help him get out.

As the Government emphasizes, Paulo's statements at the ranch are the "central evidence" that Conrado knew "Paulo's destination" was Mexico. A rational factfinder can infer from the evidence that Conrado knew Paulo intended to flee to Mexico and was assisting his brother in that effort. A rational factfinder could also infer from Conrado's failure to disclose to law enforcement what he knew of Paulo's whereabouts that he was buying time for his brother to flee and acting in furtherance of the plan to cross into Mexico to evade prosecution. The evidence is more than sufficient to support the jury's verdict.

## IV.

Conrado's final argument is that the district court abused its discretion by permitting the Government, over repeated objections, to read transcripts of his interviews with law enforcement to the jury without also playing or admitting into evidence the Spanish-language interview recordings. Conrado argues that the best evidence rule required admission of the underlying Spanish recordings themselves, relying on out-of-circuit authority. Fed. R. Evid. 1002; *see United States v. Chavez*, 976 F.3d 1178 (10th Cir. 2020).

Where, as here, there is no dispute as to the accuracy of the English-language translations of the interview transcripts, we review for abuse of discretion the district court's decision to allow the use of transcripts during trial.

*United States v. Pena-Espinoza*, 47 F.3d 356, 359 (9th Cir. 1995). A "nonconstitutional evidentiary error will be reversed for an abuse of discretion only if the court's ruling more likely than not affected the verdict." *Id*. (quoting *United States v. Yin*, 935 F.2d 990, 994 (9th Cir. 1991)).

We need not decide whether the best evidence rule required admission of the underlying Spanish-language recordings because even assuming error, the exclusion of the Spanish recordings did not materially affect the verdict. Conrado claims he was prejudiced because the guilty verdict rested on his misstatements to law enforcement, and in particular *why* he made those misstatements in his emotional state. Without the jury viewing the videos, he argues, the jury could not make such an assessment because communication is based not only on words but also verbal and non-verbal behavior.

During trial, however, the jury received ample evidence from which to assess Conrado's mental state during his videotaped interviews with law enforcement. The jury heard testimony from Lieutenant Banuelos that Conrado was emotionally upset during the first interview at his home on December 26. Deputy Sheriff Tovar likewise testified that Conrado was tired, distraught, and cried at times during the second interview at the police station. The jury also heard from Conrado's psychological expert that Conrado's state of mind during his police interviews could be characterized as a "lizard brain," gut-level reaction incapable of deliberate thought. The district court also permitted defense counsel to play two excerpts of videos—taken when Conrado was alone during breaks in the police station interview room—to show his emotional state. Finally, Conrado testified and was given the opportunity to explain his own mental state during the police interviews. On this record, Conrado fails to

demonstrate that the exclusion of the Spanish-language recordings resulted in any prejudice.

**AFFIRMED.**