**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

SERAPHINA CHARLEY,
*Defendant-Appellant.*

No. 19-10133

D.C. No.
3:18-CR-08135-SPL

OPINION

Appeal from the United States District Court
for the District of Arizona
Steven P. Logan, District Judge, Presiding

Argued and Submitted March 2, 2021
Phoenix, Arizona

Filed June 11, 2021

Before: Carlos T. Bea and Patrick J. Bumatay, Circuit
Judges, and Kathleen Cardone,[*] District Judge.

Opinion by Judge Bea;
Concurrence by Judge Bumatay

---

[*] The Honorable Kathleen Cardone, United States District Judge for
the Western District of Texas, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed Seraphina Charley's conviction on one count of making false statements to a government official, vacated her convictions on two counts of assault within the territorial jurisdiction of the United States, and remanded for a new trial on the assault counts and for resentencing on the false-statements count.

The convictions stem from an incident with Charley's boyfriend, Merle Begay, whom Charley hit in the head with a piece of rebar after, she claimed, he attacked her while he was drunk.

As to the false-statements count, Charley admitted that she lied to the FBI but contended that the Government failed to prove that she knew her conduct—lying to the FBI—was unlawful. The panel held that a rational juror could infer from the circumstantial evidence that Charley knew that it was unlawful to lie to the FBI at the time she lied.

As to the assault counts, Charley claimed self-defense. In its rebuttal case, the Government presented evidence that, roughly two years before the charged assault, Charley assaulted her stepmother and sister on separate occasions.

The panel rejected the Government's contention that evidence of these prior incidents was admissible under Fed.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

R. Evid. 404(a), which determines when character evidence may be admissible. The panel explained that although Charley's testimony about Begay may have opened the door to general reputation or opinion testimony about her propensity for violence under Fed. R. Evid. 405(a), she did not open the door to detailed descriptions of "specific instances of conduct" that were completely unrelated to Begay to show that she has a propensity for violence under Fed. R. Evid. 405(b).

The panel also rejected the Government's contention that evidence of the prior incidents was admissible under Fed. R. Evid. 404(b), which governs "other acts" evidence. Under Fed. R. Evid. 404(b)(1), evidence of a prior incident is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with character. Addressing Fed. R. Evid. 404(b)(2) regarding evidence offered to serve another purpose, the panel explained that the prior incidents do not establish either Charley's motive or intent to commit the charged assault. The panel observed that there is no logical connection between the prior incidents and the charged assault other than the implication that Charley has a propensity for violence and was therefore the aggressor on the occasion here—an impermissible inference under Rule 404(b) and an improper consideration when determining whether self-defense was established. The panel concluded that in light of the Government's potent evidence about Charley's character during its rebuttal case and the implications it made during its closing argument, the erroneous admission of the "other acts" evidence was not harmless.

Concurring, Judge Bumatay wrote separately to express his view that *United States v. Bettencourt*, 614 F.2d 214 (9th

Cir. 1980), goes too far in suggesting that prior assaults may only rarely be used to prove intent under Rule 404(b).

## COUNSEL

Molly A. Karlin (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Defendant-Appellant.

Karla Hotis DeLord (argued), Assistant United States Attorney; Krissa M. Lanham, Appellate Division Chief; Michael Bailey, United States Attorney; United States Attorney's Office, Phoenix, Arizona; for Plaintiff-Appellee.

## OPINION

BEA, Circuit Judge:

Rule 404 of the Federal Rules of Evidence prohibits evidence about a defendant's character trait to prove that the defendant committed the charged crime when he acted in accordance with that character trait. The rule is rooted in the "basic premise of our criminal justice system" that "[o]ur law punishes people for what they do, not who they are." *Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (Roberts, C.J.). Courts, as gatekeepers of evidence, are tasked with ensuring that a jury convicts a defendant based only on his alleged conduct and mental state underlying the charged crime, not based on his generalized disposition or tendency to act in a particular way—however offensive his behavior may have been in the past. In the case before us, the jury heard such

character evidence and ultimately rendered a guilty verdict, raising uncertainties about the conviction.

A jury convicted Defendant-Appellant Seraphina Charley of three counts, which included two counts of assault within the territorial jurisdiction of the United States: a Navajo reservation. Her convictions stem from an incident with her boyfriend, whom she hit in the head with a piece of rebar after, she claimed, he attacked her while he was drunk. Charley claimed self-defense at trial, testifying that she feared for her life when she swung the rebar and knocked him unconscious. In its rebuttal case, the Government presented evidence that, roughly two years before the charged assault, Charley assaulted her stepmother and sister on separate occasions. We must consider whether this evidence proves "nothing but the defendant's criminal propensities." *United States v. Sneezer*, 983 F.2d 920, 924 (9th Cir. 1992) (internal citation omitted). If, on the other hand, the evidence is relevant for some other purpose—using a propensity-free chain of reasoning—Rule 404 does not prevent its admission.

## I. BACKGROUND

The unfortunate events that gave rise to this prosecution occurred on a Navajo reservation in the early hours of March 6, 2018. At 3:34 a.m., Charley called 911 and reported that her boyfriend, Merle Begay, was unconscious and bleeding profusely. Crying for help, Charley identified herself as Hannah Charley (rather than use her real name: Seraphina Charley) and told the 911 operator that a masked man had come to the house, hit Begay in the head with a metal pipe, and then fled.

Around 4:34 a.m., Navajo Nation Police Sergeant Erwin Toddy arrived at the scene. Charley again identified herself

as Hannah (not Seraphina) and said that she was born in November 2001 (another lie: she was born in December 1988). Charley then spun a story about what had happened that night: she and Begay were drinking and watching television when they heard a noise outside; Begay went outside to investigate and returned several minutes later holding a piece of rebar before collapsing onto the floor. As Sergeant Toddy walked through the house, he smelled alcohol. Begay lay unconscious on the ground next to a piece of rebar, with a large pool of blood by his head. Paramedics intubated Begay and flew him to a trauma center, where he was treated for brain injuries.[1]

FBI Agent Jennifer Mulhollen arrived at the scene around 6:30 a.m. After Sergeant Toddy briefed her, Agent Mulhollen spoke with Charley. Charley again lied, falsely identifying herself as Hannah and stating that she was born in November 2001. Charley also repeated her story about the masked man who supposedly attacked Begay outside the home. Agent Mulhollen and Sergeant Toddy later searched the premises, but neither found any blood or evidence of a struggle outside; they found blood only inside the house where first responders found Begay. Sergeant Toddy

---

[1] Begay suffered from skull fractures, brain and intracranial injuries, a scapular fracture, a nasal bone fracture, and a fractured finger. Dr. Sam Safavi-Abbasi, the neurosurgeon who treated Begay, testified that he expects some long-term ramifications and permanent injuries. Because of the trauma and the fact that Begay was intoxicated at the time of the incident, Dr. Safavi-Abbasi did not expect Begay to remember anything from the night of the incident. Indeed, two months after the incident, Agent Mulhollen met with Begay, but he was unable to provide a statement. Begay did not testify at trial.

ultimately arrested Charley for public intoxication and booked her into the local jail.[2]

Around 3:00 p.m. later that same day, while still detained at the jail, Agent Mulhollen interviewed Charley for a second time. Agent Mulhollen summarized the physical evidence found at the scene and challenged Charley's version of events. Charley then admitted that she had lied about her name, date of birth, and how Begay was injured. She explained that Begay had attacked her, and that she had hit him in the head with the piece of rebar in self-defense. Charley also admitted that she had fabricated the story about the masked attacker because she was trying to avoid trouble.

A superseding indictment ultimately charged Charley with three counts: (1) assault resulting in serious bodily injury within the territorial jurisdiction of the United States, in violation of 18 U.S.C. § 113(a)(6) and 18 U.S.C. § 1153; (2) assault with a dangerous weapon within the territorial jurisdiction of the United States, in violation of § 113(a)(3) and § 1153; and (3) false statements to a government official, in violation of 18 U.S.C. § 1001(a)(2). Charley pleaded not guilty and proceeded to trial.

At trial, Charley asserted a self-defense claim.[3] Charley testified that, on the night of the incident, she and Begay

---

[2] Charley's charge of public intoxication is not relevant to this appeal.

[3] During the Government's case-in-chief, eight witnesses testified: the 911 operator who received Charley's call; Sergeant Toddy; the responding paramedic; Dr. Sam Safavi-Abbasi and Dr. Vincent Cariati, who treated Begay; Begay's mother, who described Begay's injuries and recovery; forensic scientist Erin Daniel, who testified about the physical evidence found at the scene; and Agent Mulhollen.

were drinking when Begay became very intoxicated.  After he suddenly became angry, he threw Charley onto the bed, held her down, choked her, and ripped off some of her clothes.  Begay had a knife in his pocket and grabbed some rope to tie her arms and wrists.  Charley was able to shake loose, but Begay warned her not to move.  Begay then turned his back briefly, as if he were getting something else from behind him, when Charley grabbed a piece of rebar laying on the floor of the bedroom.  She hit him in the back of the head three times.  Charley testified that she hit Begay because she feared for life.

Charley also testified about three violent episodes leading up to the charged offense in which she claimed that Begay had attacked her.  During one such incident, about a week before the charged offense, Begay became so violent that Charley ran out of the house in the middle of the night.  Running after her, Begay caught up to her on the road and grabbed hold of her neck.  Two passing motorists observed the altercation, stopped their car, and intervened.  The motorists took Charley to their home for the night and brought her to her aunt's house in the morning.  All three of them testified, corroborating Charley's account of that night.  Their testimony included descriptions of Charley's injuries.

During the Government's cross-examination, Charley admitted that she had lied to both Sergeant Toddy and Agent Mulhollen about her name, date of birth, and how Begay was injured.  Charley also admitted that she had provided a fake name to law enforcement officers on at least two other, uncharged occasions.  Charley reasoned that she had lied because she knew that Begay's family was dangerous and she believed that they would seek revenge against her.

During its rebuttal case, the Government sought to present evidence about two prior incidents that involved

Charley and her family, but not Begay.[4]  The Government argued that it was entitled to rebut the defense's evidence of prior incidents involving Begay purportedly attacking Charley with its own evidence of prior incidents involving Charley, even though those incidents did not involve Begay. The Government argued that the testimony would show that Charley has a tendency to drink and then get into fights.  The district court overruled Charley's objection based on Rule 404 of the Federal Rules of Evidence, but it provided a limiting instruction directing the jury to consider the evidence "only for its bearing, if any, on the question of [Charley]'s intent, motive, and identity and for no other purpose."

The Government then called three witnesses to testify about Charley's two prior incidents.  First, Charley's stepmother testified that, in June 2016, about two years before the charged assault, Charley came home intoxicated, kicked the front door, and yelled profanities at her.  Feeling threatened, Charley's stepmother managed to get away and call 911.  Second, Charley's sister testified that, in December 2015, about two and a half years before the charged assault, Charley became intoxicated and hit her on the head with a coffee mug, for which she required stitches at the hospital. Justin Banally, the responding officer, also testified about the incident with Charley's sister.

The jury ultimately found Charley guilty on all three counts.  The district court sentenced her to concurrent terms

---

[4] Before trial, the Government properly filed a notice of its intent to introduce such evidence pursuant to Rule 404(b).  Charley moved *in limine* to exclude this evidence, but the district court held the motion "under advisement . . . subject to what happens during the course of the trial."

of seventy-eight months of imprisonment for Counts 1 and 2 (the assault counts) and sixty months of imprisonment for Count 3 (the false statement count), followed by thirty-six months of supervised release.  The district court also ordered Charley to comply with the standard conditions of supervised release, which included a condition prohibiting Charley from communicating with felons without prior permission.  Charley offers a variety of challenges to both her convictions and sentence.

## II.  JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

We review de novo claims of insufficient evidence to support a jury conviction and a district court's denial of a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure.  *United States v. Vazquez-Hernandez*, 849 F.3d 1219, 1229 (9th Cir. 2017). "Evidence supporting a conviction is sufficient if, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In other words, "we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt."  *United States v. Nevils*, 598 F.3d 1158, 1165 (9th Cir. 2010).

Separately, "[w]e review de novo whether evidence is other act evidence within the meaning of Federal Rule of [Evidence] 404(b), but the admission of this evidence for abuse of discretion."  *United States v. Carpenter*, 923 F.3d

1172, 1180–81 (9th Cir. 2019). "Even where 404(b) evidence falls within a permitted purpose, it should be excluded, under Rule 403, if the court finds that its probative value is substantially outweighed by a danger of unfair prejudice." *United States v. Preston*, 873 F.3d 829, 840 (9th Cir. 2017). We review the admission of evidence under Rule 403 for abuse of discretion. *United States v. Lozano*, 623 F.3d 1055, 1060 (9th Cir. 2010).

## III.    DISCUSSION

### A. Sufficient evidence supported Charley's conviction for false statements to a government official (Count 3)

Charley first argues that we should vacate her conviction for making false statements because there was insufficient evidence from which a rational juror could find her guilty beyond a reasonable doubt. Under 18 U.S.C. § 1001(a)(2), it is a crime to "knowingly and willfully . . . make[] any materially false, fictitious, or fraudulent statement or representation" to a federal official. The superseding indictment alleged that Charley violated § 1002(a)(2) when she told the FBI that: (1) her name is Hannah Charley, though her real name is Seraphina Charley; (2) she was born in November 2001, though she was actually born in December 1988; and (3) Begay was assaulted outside their home by a masked man, though she later recanted this story. The district court instructed the jury, in relevant part, that the Government carried the burden to prove that Charley "acted deliberately and with knowledge both that the statement was untrue and that her conduct was unlawful."[5] *See Bryan v.*

---

[5] Neither party challenges this jury instruction. The Government acknowledges that the "willfulness" standard in this instruction

*United States*, 524 U.S. 184, 191–92 (1998) ("As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' In other words, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." (internal citation omitted)). Charley admits that she lied to the FBI, but she contends that the Government failed to prove that she knew her conduct—lying to the FBI—was "unlawful."

But a rational juror could infer from the circumstantial evidence presented that Charley knew it was unlawful to lie to the FBI at the time she lied. Charley admitted that she had lied to the 911 operator, Sergeant Toddy, and Agent Mulhollen on multiple occasions. She ultimately explained that she had lied to avoid getting into any trouble. Charley also admitted that she had lied to the police on other, uncharged occasions. A few weeks before the charged offense, for example, Charley provided a fictitious name, date of birth, and social security number.

Charley also lied about her identity when the FBI attempted to arrest her for the charged offense—though she could not evade arrest because her sister accurately identified her. Charley subsequently explained her state of mind at the time of this lie during a recorded jail telephone call with her new boyfriend Jared:

> Charley:   Did you see how I made up my name?

---

"arguably requires more than necessary under § 1001," but it concedes that "it is bound by" the standard because the instruction was given to the jury.

Jared:    I know. Why'd you do that? You shouldn't have done that. That probably just made it worse.

Charley:    I know. And I was like, ugh. I was like too—I was—like, I wasn't thinking straight, and I just came up with a name. And I was like, dammit. I thought I was going to get away with it until my little sister. She had to ruin everything.

Importantly, Charley told this last—albeit uncharged—lie *after* Agent Mulhollen had explicitly informed her during a prior interview that lying to a federal agent is itself a crime, demonstrating that Charley's undisputed knowledge of the law did not curtail her lies to law enforcement officers.

In determining whether the Government has carried its burden to prove a defendant's guilt beyond a reasonable doubt, "the jury is entitled to make common sense inferences from the proven facts." *United States v. Gallop*, 694 F.2d 205, 206 (9th Cir. 1982). The Government "must rely on the common sense and life experience of the jurors to fill in matters that are not provable by direct evidence, such as intent." *United States v. Ramirez*, 714 F.3d 1134, 1138 (9th Cir. 2013). Because "the evidence of innocence, or lack of evidence of guilt," is not such that "all rational fact finders would have to conclude that the evidence of guilt fails to establish" that Charley knew it was "unlawful" to lie to the FBI, *Nevils*, 598 F.3d at 1164, we affirm Charley's conviction for making false statements, *see United States v. Singh*, 979 F.3d 697, 714 (9th Cir. 2020) (explaining that "it is our 'traditional rule that ignorance of the law is no excuse'

from liability" and holding that "the evidence proffered at trial indicated that [defendants] took steps to conceal their actions, which suggests that they possessed knowledge that their actions were unlawful, not that they unwittingly engaged in criminal conduct" (quoting *Bryan*, 524 U.S. at 196)).

## B. Evidence of Charley's prior incidents was inadmissible under Rule 404, entitling her to a new trial (Counts 1 and 2)

At trial, Charley testified about three violent episodes in which Begay had attacked her, leading up to the charged offense. Charley suggested that these prior episodes explain why she feared for her life and felt compelled to defend herself when she claimed Begay had attacked her on the night of the charged offense. Several fact witnesses testified and corroborated her account of at least one of these episodes.

Afterwards, during the Government's rebuttal case and over Charley's Rule 404 objection, the district court allowed the Government to present evidence about two incidents that had occurred before the night of the charged offense in which Charley allegedly attacked members of her family on separate occasions, neither of which involved Begay. First, Charley's stepmother testified that Charley arrived at the home intoxicated, kicked the front door, and yelled profanities at her. Second, Charley's sister testified that Charley became intoxicated and hit her on the head with a coffee mug. In an attempt to carry its burden, *see United States v. Alfonso*, 759 F.2d 728, 739 (9th Cir. 1985), the

Government argues that the evidence was admissible under both Rule 404(a) and Rule 404(b).[6]

## 1. Character evidence under Rule 404(a)

Generally, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1).  But the Federal Rules of Evidence allow a defendant in a criminal case to "offer evidence of an alleged *victim's* pertinent trait." Fed. R. Evid. 404(a)(2)(B) (emphasis added).  And if the defendant does so, and the evidence is admitted, the government may then "offer evidence of the *defendant's* same trait." *Id.* (emphasis added).

Although Rule 404(a) determines *when* character evidence may be admissible, Rule 405 "determine[s] what *form* that evidence may take." *United States v. Keiser*, 57 F.3d 847, 855 (9th Cir. 1995) (emphasis in original); *see also* Advisory Committee Notes, Fed. R. Evid. 404 ("Once the admissibility of character evidence in some form is established under [Rule 404], reference must then be made to Rule 405, which follows, in order to determine the appropriate method of proof.").  Typically, only general reputation or opinion testimony is proper to show that a defendant accused of assault has a propensity for violence. *See* Fed. R. Evid. 405(a).  Under limited circumstances, however, Rule 405 allows two methods by which the government can prove a character trait with specific

---

[6] At trial, the district court admitted the evidence of Charley's prior incidents under Rule 404(b) and provided a limiting instruction, directing the jury to consider Charley's prior incidents "only for its bearing, if any, on the question of [Charley]'s intent, motive, and identity and for no other purpose."

instances of the defendant's conduct: (a) discrediting a character witness's testimony during cross-examination; or (b) proving or disproving character "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense." *See* Fed. R. Evid. 405(a)–(b). In this case, the Government could have offered general reputation or opinion testimony about Charley's character after she testified about Begay. But the Government was not permitted to offer specific instances of Charley's prior conduct unrelated to Begay to prove that she has a propensity for violence because neither of the two exceptions set out in Rule 405(a) and (b) were applicable.

First, under Rule 405(a), the Government did not elicit detailed testimony regarding Charley's two prior incidents "[o]n cross-examination of the character witness." Fed. R. Evid. 405(a). Instead, the Government elicited this testimony from Charley's stepmother and sister on direct examination during its rebuttal case. This first exception, therefore, was not applicable.

Second, under Rule 405(b), Charley's propensity for violence was not "an essential element" of her self-defense claim. In *United States v. Keiser*, 57 F.3d 847 (9th Cir. 1995), Keiser, like Charley, was tried for assault in violation of 18 U.S.C. § 113. *Id.* at 848. Keiser's only defense was that he was acting in defense of his brother, whom the victim was assaulting at the time Keiser shot the victim. *Id.* at 852. Keiser attempted to introduce a specific instance of the victim's conduct that had occurred after the shooting to prove that the victim has a propensity for violence, supporting the proposition that the victim was using unlawful force at the time of the shooting and thereby bolstering Keiser's self-defense claim. *Id.* We held, however, that the district court properly excluded the

evidence because "victim character evidence introduced to support a claim of self-defense or defense of another should be limited to [general] reputation or opinion evidence." *Id.* at 855. We reasoned that a victim's violent character did not constitute an essential element of a self-defense claim because a defendant "could, for example, successfully assert a claim of self-defense against an avowed pacifist, so long as the jury agrees that [he] reasonably believed unlawful force was about to be used against him." *Id.* at 857.

Although our holding in *Keiser* was limited insofar as it prevents a defendant from seeking to have the district court admit into evidence specific instances of conduct to prove a *victim's* violent character, the same rationale applies here, where the Government sought to have the district court admit into evidence specific instances of conduct to prove the *defendant's* violent character. Indeed, we explained that in determining whether violent character is "an essential element" of a self-defense claim under Rule 405(b), "[t]he relevant question should be: would proof, or failure of proof, of the character trait by itself actually satisfy an element of the charge, claim, or defense? If not, then character is not essential and evidence should be limited to [general] opinion or reputation" testimony. *Id.* at 856.

Here, as in *Keiser*, Charley's propensity for violence is not dispositive to the success of her self-defense claim; it therefore fails to constitute "an essential element" under Rule 405(b). *See id.* at 857. A person of violent character can still prevail on a self-defense claim. Even were it proven that Charley is an exceedingly violent person, a jury would still be required to assess the factual circumstances underlying her conduct on the night of the charged offense and would be free to determine whether Begay was using unlawful force against Charley, whether the force Begay was

using against Charley was likely to cause death or great bodily harm, whether Charley reasonably believed that force was necessary to prevent death or great bodily harm, and whether Charley used no more force than appeared reasonably necessary under the circumstances. In other words, Charley's "claim of self-defense neither rises nor falls on [the Government's] success in proving that [Charley] has a penchant for violent outbursts." *Id.*

Specific instances of prior conduct offered to prove one's character "possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time," so "the rule confines the use of evidence of this kind to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry." Advisory Committee Notes, Fed. R. Evid. 405. Although Charley's testimony about Begay may have opened the door to general reputation or opinion testimony about her propensity for violence under Rule 405(a), she did not open the door to detailed descriptions of "specific instances of conduct" that were completely unrelated to Begay to show that she has a propensity for violence under Rule 405(b).

We next address whether Charley's prior incidents were admissible for a purpose other than proving her character— for example, to prove Charley's identity, motive, or intent to commit the charged offense. *See Keiser*, 57 F.3d at 853 (distinguishing between the "introduction of specific acts as victim character evidence [to] support the proposition that the victim was in fact using unlawful force" in a self-defense claim and "specific acts to prove the defendant's state of mind [to] support the proposition that the defendant's belief that force was necessary was reasonable").

## 2. "Other acts" evidence under Rule 404(b)

It is well-established that evidence of a prior crime, wrong, or incident "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). "The rule is designed to avoid a danger that the jury will punish the defendant for offenses other than those charged, or at least that it will convict when unsure of guilt, because it is convinced that the defendant is a bad man deserving of punishment." *United States v. Brown*, 880 F.2d 1012, 1014 (9th Cir. 1989) (internal citation omitted). Rule 404(b), however, carves out an exception to the general rule where the proposed evidence is offered to serve "another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

The Government carries the burden to prove that the proposed evidence satisfies four requirements:

> (1) the evidence tends to prove a material point (materiality); (2) the other act is not too remote in time (recency); (3) the evidence is sufficient to support a finding that defendant committed the other act (sufficiency); and (4) . . . the act is similar to the offense charged (similarity).

*United States v. Berckmann*, 971 F.3d 999, 1002 (9th Cir. 2020). But even then, "[t]he use of such evidence must be narrowly circumscribed and limited." *United States v. Bailleaux*, 685 F.2d 1105, 1109 (9th Cir. 1982). "Courts must be extremely careful to guard against the danger that defendants will be convicted because they have previously committed a [prior] serious criminal offense rather than

because the Government has introduced evidence sufficient to prove beyond a reasonable doubt that they are guilty of the offense for which they are being tried." *Id.*

Here, the Government argues that Charley made her motive and intent to assault Begay central issues simply by claiming self-defense. Specifically, the Government contends that Charley's prior incidents—(1) kicking her stepmother's door and yelling profanities and (2) hitting her sister on the head with a coffee mug—show "who the initial aggressor was in Begay's assault." But there is no logical connection between those prior incidents and the charged assault other than the implication that Charley has a propensity for violence and was therefore the aggressor on the occasion here—an impermissible inference under Rule 404(b) and an improper consideration when determining whether self-defense was established.

First, the prior incidents do not establish Charley's motive to commit the charged assault against Begay. "[P]rior bad act evidence is allowed to show motive only when motive is in turn relevant to establish an element of the offense that is a material issue." *Brown*, 880 F.2d at 1014. But "[t]he prior wrongful acts must establish a motive to commit the crime charged, not simply a propensity to engage in [violence]." *Id.* at 1015. Here, no evidence whatsoever links Charley's motive to assault Begay to her prior incidents that involved her stepmother and sister, but not Begay himself. *Cf. United States v. Bowman*, 720 F.2d 1103, 1105 (9th Cir. 1983) (affirming admission of defendant's prior assault against wife's relative to prove motive of revenge in defendant's assault against wife because "there was a sufficient factual relationship between the two incidents" as "[i]t was the government's contention that [defendant] attacked [his wife] because of his belief that she was

responsible for his earlier conviction"). We cannot discern any details in the prior incidents from which Charley could have derived a motive to assault Begay. The prior incidents here "clearly establish [Charley]'s propensity for violence, but that is precisely the use of evidence barred by Rule 404(b)." *See Brown*, 880 F.2d at 1015 (vacating conviction and rejecting government's argument that defendant "made motive a key issue" by suggesting that defendant had no motive to commit the alleged crime).

Nor do the prior incidents establish Charley's intent to commit the charged assault against Begay.[7] Generally, an intent to assault is not transferrable across dissimilar and unique sets of circumstances. *See United States v. Bettencourt*, 614 F.2d 214, 217 (9th Cir. 1980) ("A showing of intent to assault on an earlier occasion proves little, if anything, about an intent to assault at some later time."). In fact, in *United States v. Bettencourt*, we recognized that "[p]rior crimes involving deliberate and carefully premeditated intent such as fraud and forgery are far more likely to have probative value with respect to later acts than prior crimes involving a quickly and spontaneously formed intent such as [an] assault," for which Charley was tried and convicted here. *See id.* at 217 n.7. We held that the district court erred in admitting Bettencourt's prior arrest for interfering with and assaulting local officers to prove Bettencourt's later intent to commit the charged offense of interfering with and assaulting federal officers because

---

[7] The district court instructed the jury that the Government carried the burden to prove that "[Charley] assaulted [Begay] by intentionally, knowingly, or recklessly striking or wounding him." "[T]he common law definition of assault, a general intent offense that requires a showing of willfulness, has been incorporated into the federal offense of assault resulting in serious bodily injury, 18 U.S.C. § 113(a)(6)." *United States v. Garcia-Jimenez*, 807 F.3d 1079, 1085–86 (9th Cir. 2015).

"specific intent to assault or impede is not ordinarily transferrable to events two years apart." *Id.* at 217. We reasoned that "[d]iscrete intent, spontaneously resulting from a unique set of circumstances, is the more usual case."[8] *Id.*

The Tenth Circuit addressed this legal issue in *United States v. Commanche*, 577 F.3d 1261 (10th Cir. 2009), where it encountered factual circumstances similar to those alleged here. Like Charley, Commanche was tried for assault and argued that the circumstances underlying his convictions for two prior batteries were inadmissible under Rule 404(b). *Id.* at 1266. Noting that the only disputed issue in the case was Commanche's self-defense claim, the court held that the district court erred in admitting evidence of his convictions for the two prior batteries to establish Commanche's intent to commit the charged assault:

> [T]he present case is not one in which intent is proven circumstantially based on repeated substantially similar acts. There is no indication in the record that Commanche claimed self defense on the two other occasions. . . . [T]he details of Commanche's prior aggravated battery convictions demonstrate nothing about his intent; they simply show that he is violent. It may be that Commanche's violent character would lead a jury to conclude that his fear was unreasonable or that he acted with

---

[8] Even if this reasoning were to constitute dicta, it is "[w]ell-reasoned dicta," by which we are bound. *Li v. Holder*, 738 F.3d 1160, 1164 n.2 (9th Cir. 2013) (citing *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc)).

> disproportionate force and thus cannot properly claim self defense. Although this reasoning may have intuitive appeal, it is precisely what Rule 404(b) prohibits—a chain of inferences dependent upon the conclusion that Commanche has violent tendencies and acted consistent with those tendencies during the fight.

*Id.* at 1268–69. Relying on *United States v. Sanders*, the court vacated the conviction because the "jury could not escape[] the clear articulation that Commanche was a violent and aggressive person who was merely repeating that tendency." *Id.* at 1268; *see also United States v. Sanders*, 964 F.2d 295, 297 (4th Cir. 1992) (vacating assault conviction and holding that district court erred in admitting prior assault because "[t]he fact that [defendant] had committed an [earlier] assault on another prisoner . . . had nothing to do with his reason for—his intent in—stabbing [this victim]" so the prior assault proved "his general propensity to commit violent crimes").

Furthermore, the Government fails to carry its burden in establishing a cogent basis from which to infer Charley's intent to assault Begay from the factual circumstances underlying the prior incidents with her stepmother and sister. Neither prior incident is similar enough to the circumstances underlying the charged offense to provide any insight into whether Charley intended to strike Begay for reasons other than self-defense. First, the prior incidents were confined to members of Charley's immediate family, whereas the charged offense occurred within the context of a romantic relationship. Second, the record lacks any pattern of violence between Charley and her stepmother or sister that precipitated the prior incidents. *Cf. United States v. Hinton*,

31 F.3d 817, 822–23 (9th Cir. 1994) (finding no error in admitting evidence of prior assaults because "the charged and prior conduct were part of a pattern of abuse involving the *same victim* and . . . similar *modus operandi*" (emphasis added)).    Third, unlike the charged offense, there is no evidence in the record that Charley defended herself by asserting a self-defense claim to either of the prior incidents.**⁹**    And finally, the prior incidents, which did not include Begay in any manner whatsoever, involved dissimilar victims compared to the charged offense. *Cf. Berckmann*, 971 F.3d at 1002–04 (distinguishing *Bettencourt* because "prior (and subsequent) acts of violence towards *the identical victim* can shed light on the mindset of the defendant during the charged crime" (emphasis added)). No single criterion, by itself, is dispositive.    But, cumulatively, these criteria reveal a sufficient variance between the prior incidents and the charged offense such that Charley's earlier intent to assault cannot be transferred to her later intent here.

Mindful that "[t]he greater is the dissimilarity of the two offenses, the more tenuous is the relevance," we are

---

**⁹** We recognize, however, that this consideration would likely favor the Government's position if, for example, Charley had been involved in several physical confrontations and had routinely claimed self-defense in every single one of them.    If that were the case, the similar circumstances underlying the prior claims of self-defense—and, with it, the prior assaults—would reveal a suspicious pattern of thin excuses and thus acquire the requisite similarity to the charged offense. *See United States v. Henthorn*, 864 F.3d 1241, 1253 (10th Cir. 2017) (distinguishing *Commanche* and explaining that the case was "more akin to a hypothetical version of *Commanche* in which the defendant was involved in several fights and always claimed self-defense" because "[a]t some point, the court may reasonably begin to question whether the defendant actually acted in self-defense and whether his use of force was justified").

compelled to conclude that the two prior incidents and the charged offense are simply too dissimilar to infer properly that Charley intended to assault Begay. *See United States v. Hernandez-Miranda*, 601 F.2d 1104, 1109 (9th Cir. 1979) (finding error in admitting evidence of prior conviction for smuggling marijuana in a backpack to establish defendant's later intent in importing heroin in a car). Evidence of the prior incidents "does not tell the jury anything about what the defendant intended to do in [her] later action—unless, of course, one argues (impermissibly) that the prior act establishes that the defendant has criminal propensities." *United States v. Miller*, 874 F.2d 1255, 1269 (9th Cir. 1989) (vacating espionage conviction where district court erred in admitting evidence of defendant's prior bribery because it was "too dissimilar from most of the offenses charged . . . to serve as valid proof of [his] intent" to solicit money from a foreign government). We do not mean to say that prior assaults may never be admissible to prove elements of future assaults. But here, given that Charley's intent to kick her stepmother's door and intent to hit her sister in the head are separated from the charged offense by such space and context, the jury was allowed to infer impermissibly that Charley has a propensity for violence and thus must have intended to assault Begay. Charley's earlier intent to assault her stepmother and sister would be admissible only if the similarity of the circumstances underlying those incidents alone—and not Charley's violent propensity implied by the incidents—supplied an independent basis for establishing her later intent to assault Begay. *See United States v. Rodriguez*, 45 F.3d 302, 307 (9th Cir. 1995) (vacating conviction and holding that district court erred in admitting evidence of defendant's prior fight with different inmate because it impermissibly established character). Because the Government fails to articulate a "propensity-free chain of reasoning" between the prior incidents and the charged

offense, the evidence is inadmissible under Rule 404(b). *United States v. Rodriguez*, 880 F.3d 1151, 1168 (9th Cir. 2018).[10]

### 3. The "other acts" evidence was not harmless

"Where a district court errs in admitting other act[s] evidence, we review for harmless error." *Carpenter*, 923 F.3d at 1181. Evidentiary errors "are not harmless unless it is more probable than not that the erroneous admission of the evidence did not affect the jury's verdict." *United States v. Hill*, 953 F.2d 452, 458 (9th Cir. 1991). Mindful that we must "start with a presumption of prejudice" as to the effect of "other acts" evidence, the district court's erroneous admission of Charley's prior incidents entitles her to a new trial on Counts 1 and 2. *Carpenter*, 923 F.3d at 1182.

The Government's presentation of evidence related to Charley's prior incidents was neither trivial nor fleeting. On the contrary, the evidence comprised nearly its entire rebuttal case, spanning across three witnesses. Charley's stepmother first testified that Charley allegedly kicked the front door and yelled profanities at her. Next, Charley's sister testified that Charley hit her on the head with a coffee mug. Justin Banally, the responding officer, also testified about the incident, describing the blood that he had observed at the scene. In fact, the Government presented striking photographs of the injuries, including one taken in the hospital revealing the sister's stitches. Even the district court

---

[10] Because the district court erred in admitting Charley's prior incidents under Rule 404(b), we need not reach the final consideration in the analysis: "whether the probative value [of the other acts evidence] is substantially outweighed by the prejudicial impact under Rule 403." *United States v. Chea*, 231 F.3d 531, 534 (9th Cir. 2000).

noted the "significant" impact of these photographs during Charley's sentencing hearing.

The Government continued to highlight the prior incidents in its closing argument:

> The defendant put on evidence that the victim has a character for violence. In fact, the defendant testified he gets violent when he drinks.

> The evidence really showed that's true for her. The evidence showed that pretty much every incident we heard about, she was intoxicated.

> The evidence showed that she did not have the same demeanor that she had here on the stand when she was out in the community with other people, with her own loved ones.

> Sure, it was not easy for her family to come in here and testify yesterday, but her step mother told you what she has been like for the last nine years since she has been married to the defendant's father, living with her on and off.

> She told you about how she—how the defendant attacks her one time when she's just had surgery, she's walking with a cane—because she didn't get to the door in time?

> And you heard that the defendant attacked her little sister, her 18 year-old

sister, who wanted to be alone with her six-month-old baby and asked the drunk defendant to leave. And she grabbed the closest item to her, coffee mug, and smashed it into her sister's head.

You heard the scene that the officer walked into there. Maybe not quite as bloody as this one, but it sounded familiar. She had to get stitches in her head. You saw the picture of her finger. That's what the defendant did in a completely unprovoked attack on her sister.

Even where evidence of other acts is admissible, it is impermissible for the Government to argue that such evidence reflects the defendant's character. *See United States v. Derington*, 229 F.3d 1243, 1247 (9th Cir. 2000) (explaining that the "prosecutor's argument to the jury highlighting [defendant]'s greed touches on a trait of character," which "was inadmissible to prove [defendant] was greedy").[11]

Other than Charley's prior incidents, the Government did not present overwhelming evidence to establish that Charley struck Begay for reasons other than self-defense. Begay did not testify, but Charley took the stand and testified that she defended herself against Begay because she feared for her life. No one else witnessed the incident. Although Charley's credibility was undoubtedly damaged due to her several misrepresentations to law enforcement officers,

---

[11] Charley also alleges claims of prosecutorial misconduct related to the Government's closing argument, but it is unnecessary for us to reach this issue.

Charley had several witnesses corroborate her account that on at least one occasion Begay had attacked her on the days leading up to the charged offense.

In light of the Government's potent evidence about Charley's character during its rebuttal case—the last evidence that the jury was to hear—and the implications it made during its closing argument, "it [is] impossible for us to say it is more likely than not that they did not affect the jury's verdict." *Brown*, 880 F.2d at 1016. "[W]hen faced with the single disputed issue in the case—self defense—the jury could not escape[] the clear articulation that [Charley] was a violent and aggressive person who was merely repeating that tendency." *Commanche*, 577 F.3d at 1270 (vacating assault conviction where district court admitted evidence of prior assaults); *see also Brown*, 880 F.2d at 1016 (vacating conviction because "[d]espite the other evidence against [defendant], the continued references to [defendant]'s prior bad acts" make it that "[a] reasonable juror . . . might have elected to convict [defendant] of that offense based on the bad act evidence admitted"). Because character evidence "is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge," the erroneous admission of this evidence was not harmless. *Michelson v. United States*, 335 U.S. 469, 476 (1948). Accordingly, we vacate and remand for a new trial on Counts 1 and 2.[12]

---

[12] Charley also contends that the terms of her supervised release, which prohibit her from communicating with felons, violate her fundamental rights because "one or both of Charley's brothers . . . may be felons." In light of our decision to vacate Charley's two assault convictions, we need not reach this issue. We also decline to reach

## IV.    CONCLUSION

Based on the reasons stated herein, we **AFFIRM** Charley's conviction for making false statements to a government official (Count 3), **VACATE** Charley's two convictions for assault (Counts 1 and 2), and **REMAND** for a new trial on Counts 1 and 2 and for resentencing on Count 3.

---

BUMATAY, Circuit Judge, concurring:

I join the majority opinion in full.  The law dictates that we affirm Seraphina Charley's 18 U.S.C. § 1001 false statement conviction and reverse her two 18 U.S.C. § 113(a) assault convictions.  In reversing the two assault convictions, the majority dutifully follows our binding precedent in *United States v. Bettencourt*, 614 F.2d 214 (9th Cir. 1980). I write separately only to express my view that *Bettencourt* goes too far in suggesting that prior assaults may only rarely be used to prove intent under Federal Rule of Evidence 404(b).  The limitations set by that case have no basis in the Rules of Evidence and conflict with the rationale of our other decisions.  In the appropriate case, we should dispense with *Bettencourt*.

### I.

Rule 404(b) expressly allows courts to admit a person's prior acts to prove "intent."    Fed. R. Evid. 404(b)(2).

Charley's allegation that the Government committed prosecutorial misconduct during its closing argument.  We note, however, that our decision is without prejudice to allow Charley to raise these issues to the district court on remand.

Nothing in the Rule limits its application to specific kinds of intent. In other words, the Rule neither explicitly nor implicitly constructs a hierarchy of intents. And I see no reason to conclude that some intents are categorically more probative than others. To the contrary, Rule 404(b) requires a case-by-case assessment of materiality, similarity, sufficiency of proof, and remoteness. *United States v. Preston*, 873 F.3d 829, 840 (9th Cir. 2017).

Rather than focusing only on these factors, *Bettencourt* makes sweeping pronouncements on the nature of "intent" and sets unnecessary limitations on the use of other acts evidence. First, *Bettencourt* proclaims, without citing any authority, that "specific intent to assault or impede is not ordinarily transferrable to events two years apart." 614 F.2d at 217. It then broadly pronounces that a "showing of intent to assault on an earlier occasion proves little, if anything, about an intent to assault at some later time." *Id*. Finally, endorsing a hierarchy of intents, *Bettencourt* approves the belief that "intent such as fraud and forgery are far more likely to have probative value with respect to later acts" than intent to assault. *Id*. at n.7 (simplified).

But these conclusions are more a product of speculation and judicial psychologizing than they are of Rule 404(b)'s text. One would expect that concepts about the nature and transferability of mental states would be based on scientific reasoning or at least on findings from Congress or the Advisory Committee. But *Bettencourt* doesn't provide that. Instead, it resorted to lay musings on the workings of the brain. While it may be correct that some (maybe even most) prior assaults have no probative value for future assaults, I see no reason to all but rule out the possibility. For example, why can't an assault be as "deliberate" or "carefully premeditated" as a fraud or forgery, as *Bettencourt* suggests?

*Id*. It is easy to think of examples that illustrate why that belief is wrong—just ask the victims of Jack the Ripper, a hate crimes perpetrator, or a serial domestic abuser. Without a textual or non-conjectural basis for construing Rule 404(b) this way, I would not so severely confine its application. *Cf. United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (en banc) ("Rule 404(b) is a rule of inclusion—not exclusion[.]").

Our court has since backed away from the blanket notion that intent to assault is not transferrable. In *United States v. Berckmann*, 971 F.3d 999, 1003–04 (9th Cir. 2020), we affirmed the admission of a defendant's other attacks against his wife to prove an intent to assault. In so doing, we explained that other acts of violence "can shed light on the mindset of the defendant during the charged crime." *Id.* at 1002. Moreover, the defendant's intent was probative, even though the other acts involved dissimilar modes of violence. *See id.* at 1001 (describing multiple assaults involving a kitchen knife, a glass bottle, and fists). So long as the other acts evidence is "introduced to help the jury understand the relationship between the defendant and a particular victim," and not "to characterize the defendant as someone who has a propensity to be violent," the evidence is admissible. *Id.* at 1004; *see also United States v. Hinton*, 31 F.3d 817, 822 (9th Cir. 1994) (limiting *Bettencourt*'s binding dictum and admitting prior assaults that were part of a pattern of abuse).

The tensions between *Berckmann* and *Bettencourt* are obvious. *Berckmann* undercuts *Bettencourt*'s belief that intent to assault is never transferrable across time or distinct events. Even though *Berckmann* happened to involve the same victim, nothing limits its rationale *only* to assaults involving the same victim. If the *Berckmann* defendant had committed several acts of domestic abuse against *other*

women, it is hard to believe that such evidence would be immaterial to his intent. And what about a hate crimes defendant? Repeated assaults on *other* minorities are surely probative of intent. *See* 18 U.S.C. § 249. The examples could go on and on. *See, e.g.*, *United States v. Steele*, 550 F.3d 693, 700–01 (8th Cir. 2008) (admitting prior acts against different victims). Above all, Rule 404(b) permits other acts evidence to show motive, opportunity, intent, and so forth, but doesn't confine such uses to conduct related to the same victim. That is simply not part of the Rule.

Even more, the Federal Rules of Evidence permitted the Government to admit reputation or opinion testimony about Charley's violent character after she raised her victim's violent past. *See* Fed. R. Evid. 404(a), 405(a). From that character evidence, the jury could infer Charley's intent or lack of self-defense when she attacked the victim. If Charley's violent *character* was probative of intent, it is hard to see why specific acts could not also be probative in the right case. After all, the factual predicates for the reputation or opinion testimony would still have been Charley's prior attacks. Again, it would involve the same transfer of intent across unique circumstances that *Bettencourt* decries.[1]

## II.

Rule 404(b)'s text doesn't suggest the restrictions on the admissibility of prior assaults that *Bettencourt* creates. Common sense doesn't require them either. I fear that some of *Bettencourt*'s broad pronouncements will result in the

---

[1] While the majority opinion doesn't reach the issue, I would also deny Charley's claims of prosecutorial misconduct. Although one harmless factual error was made, I would find no misconduct in the government's closing arguments.

exclusion of probative evidence that ought to have been admitted. We could avoid this consequence by excising *Bettencourt*'s lay psychologizing and simply focusing on the dissimilarities of the other assaults.

Because the non-propensity connection between Charley's prior acts and the charged conduct here is not strong, even without *Bettencourt*, I agree that we must reverse her assault convictions. But as the majority opinion makes clear, this does not mean prior assaults can never be used to show intent—even involving different victims. To the extent *Bettencourt* conflicts with this reading of Rule 404(b), it should be overruled in the appropriate case.

With these observations, I concur.